**UNITED STATES of America,
Plaintiff,**

v.

**ALL FUNDS ON DEPOSIT IN DIME SAVINGS BANK OF WILLIAMS-BURG ACCOUNT NO. 58–400738–1 IN THE NAME OF ISHAR ABDI AND BARBARA ABDI, et al., Defendants.**

**No. 01 CV 2051(RML).**

United States District Court,
E.D. New York.

Feb. 19, 2003.

---

14. This argument was specifically rejected in *Jolly v. Coughlin,* 894 F.Supp. at 745.

Michael J. Goldberger, Sarah J. Lum, Elliot Schachner, Asst. U.S. Attys., U.S. Attorney's Office–EDNY, Brooklyn, NY, for Plaintiffs.

Ronald E. DePetris, DePetris and Bachrach, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

LEVY, United States Magistrate Judge.

This matter appears before me on consent of the parties, pursuant to 28 U.S.C. § 636. Presently pending are claimant Barbara Abdi's motions for judgment on the pleadings and for leave to amend her answer to assert a statute of limitations defense, and plaintiff's cross-motion for leave to amend the complaint. For the reasons set forth below, claimant's motion for judgment on the pleadings is denied, the government's cross-motion for leave to amend the complaint is granted, and claimant's motion to amend the answer to assert a statute of limitations defense is granted.

## PROCEDURAL BACKGROUND

The United States commenced this civil forfeiture action on April 2, 2001. According to the United States, the defendant properties are subject to forfeiture because they constitute the proceeds of a health care fraud and mail fraud scheme perpetrated by Ishar Abdi, M.D. ("Dr. Abdi"), the husband of claimant Barbara Abdi ("claimant" or "Barbara Abdi"), and because they were involved in or are traceable to monetary transactions made in violation of 18 U.S.C. § 1957. On April 23, 2001, Dr. Abdi pleaded guilty to health

care fraud, in violation of 18 U.S.C. § 1347.[1] As part of his plea, he agreed to forfeit $1.49 million, including his interest in all of the defendant properties. By order dated May 5, 2001, the court ordered his interest in these properties to be forfeited (*see* Declaration of Michael J. Goldberger, Esq., dated Nov. 12, 2002 ("Goldberger Decl."), Exs. 1, 4), and it ordered Dr. Abdi to pay $710,000 in settlement of his civil liabilities under the False Claims Act. (*Id.*, Ex. 5.)

The United States alleges that the fraud proceeds were all initially deposited into the defendant Dime Savings Bank of Williamsburg Account (the "Dime Savings Bank Account"), a joint account with title held in the names of both Ishar Abdi and Barbara Abdi, and that both Ishar and Barbara Abdi made transfers from that account to the other defendant properties. According to the complaint, approximately $430,000 was transferred from the Dime Savings Bank Account to the defendant investment account at Charles Schwab & Co. (the "Schwab Account"), held in the names of Ishar and Barbara Abdi. In addition, from January 1995 to April 2000, the Abdis allegedly paid the mortgage on their home at 1 Trusdale Drive in Old Westbury, New York (the "Old Westbury House"), approximately $10,385 per month, from the Dime Savings Bank Account.

(Verified Complaint in Rem, dated March 30, 2002 ("Compl."), ¶ 46.) The Abdis also paid their mortgage on a condominium located at 207–23 Darren Drive in Bayside, New York (the "Bayside Condominium"), and purchased two cooperative apartments at 59 Pineapple Street in Brooklyn, New York (the "Pineapple Street Apartments") using the funds in the Dime Savings Bank Account. (*Id.* ¶¶ 47, 49.) The cooperative shares associated with one of those apartments, Apartment 5K, were purchased in the names of Ishar and Barbara Abdi for $110,000. (*Id.* ¶ 49.) The cooperative shares associated with the other apartment, Apartment 4J, were purchased solely in the name of Ishar Abdi for $70,000. (*Id.*) Finally, on or about September 26, 2000, the Abdis took a new mortgage on the Old Westbury House in the approximate amount of $425,000, the proceeds of which they deposited into the Dime Savings Bank Account. (*Id.* ¶ 48.) The defendant properties *in rem* therefore consist of: (a) the funds on deposit in the Dime Savings Bank Account, (b) the Schwab Account, (c) the proceeds of the sale of the Old Westbury House,[2] (d) the two cooperative apartments at 59 Pineapple Street, and (e) the Bayside Condominium.[3]

The ten forfeiture claims in the complaint fall into two categories. The first

1. According to the complaint, Dr. Abdi, an internist, carried out the scheme over a period of approximately five and a half years, from January 1995 through June 2000. (Compl. ¶ 30.) During that period, Dr. Abdi's medical practice consisted almost entirely of making home visits to Medicare patients in Brooklyn, Queens and Nassau County. (*Id.* ¶¶ 28, 30.) Dr. Abdi employed a variety of techniques to inflate his Medicare and Medicaid reimbursements, including billing for services totaling more than 24 hours in one day, and billing for patients who were in fact dead. (*Id.* ¶¶ 35–41.) During the period at issue, Dr. Abdi is alleged to have reaped at least $1.8 million in fraud proceeds. (*Id.* ¶¶ 30–33, 43.)

2. The Old Westbury House was sold, pursuant to a Stipulation and Order of Interlocutory Sale signed by the Honorable Nina Gershon, United States District Judge, on August 14, 2001. The United States Marshals Service is currently holding the net proceeds of the sale, totaling $808,381.52, in escrow pending the resolution of this action.

3. By letter dated October 23, 2002, the Assistant United States Attorney informed the court that the Marshals Service had accepted an offer of $125,000 on 59 Pineapple Street, Apartment 4J, and had several interested buyers in the Bayside Condominium. (*See* Letter to the court from Michael J. Goldberger, Esq., dated Oct. 23, 2002.)

category constitutes claims seeking forfeiture of properties involved in money laundering transactions (*i.e.*, monetary transactions in property derived from specified unlawful activity) in violation of 18 U.S.C. § 1957. The second category constitutes claims seeking forfeiture of properties that constitute or are derived from proceeds traceable to a violation of specified unlawful activity. (*See* Compl.)

In her Verified Claim, Barbara Abdi claims an ownership interest in all of the defendant properties, and she asserts among her affirmative defenses that she did not have knowledge of her husband's criminal conduct. As to the funds in the Dime Savings Bank Account and in the Schwab Account, she claims to be a "joint tenant with right of survivorship or tenant in common." (Verified Claim, dated June 12, 200, ¶¶ 1, 2.)[4] She also claims to be a "tenant by the entirety" with respect to the Old Westbury House and the Bayside Condominium. (*Id.* ¶¶ 3, 4.) Finally, as to the Pineapple Street Apartments, she claims to be the "beneficiary of a constructive trust," and/or that the property was purchased and the interest acquired "by payment of marital property." (*Id.* ¶¶ 5, 6.)

### DISCUSSION

A. *Claimant's Motion for Judgment on the Pleadings*

1. *Claims brought under CAFRA*

Claimant argues that the first, third, fifth, seventh, and ninth claims, which seek forfeiture of proceeds traceable to a federal health care or mail fraud offense under 18 U.S.C. § 981, fail to state claims upon which relief can be granted. (Memorandum of Law in Support of Claimant's Mo-

tion for Judgment on the Pleadings, dated Aug. 20, 2002 ("Claimant's Mem."), at 5.) These claims rely in material respects on the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), which became effective on August 23, 2000 and amended 18 U.S.C. § 981(a)(1)(C) to provide for civil forfeiture of proceeds traceable to any offense constituting "specified fraudulent activity," which includes federal health care fraud and mail fraud. *See* 18 U.S.C. § 1956(c)(7). According to claimant, CAFRA cannot apply to the defendant properties because the acts that constituted Dr. Abdi's fraud offenses occurred prior to the effective date of CAFRA, which, claimant argues, cannot apply retroactively. (Claimant's Mem. at 5–12.)

 Claimant's argument relies in large part on *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), in which the Supreme Court set forth standards for determining whether a newly enacted statute may be applied retroactively to cases pending at the time of enactment. The Court explained that the first step of the inquiry is to determine whether the statute itself contains a clear expression of Congressional intent as to its temporal reach. *Id.* at 280, 114 S.Ct. 1483. If the statute does not contain an "express command," then the court

must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.

*Id.* However, if Congress has indicated its intent, then there is no need to resort to these judicial default rules. *Id.*

Pursuant to 8 U.S.C. § 1324, the amendments contained in CAFRA "*shall* apply to

---

4. Pursuant to a stipulation and order, the government has been releasing the seized funds to claimant to cover her living expenses since August 2001. (*See* Reply Declaration of Michael J. Goldberger, dated Nov. 12, 2002, Exs. C, D.)

any forfeiture proceeding commenced on or after the date that is 120 days after the date of enactment of this Act." (emphasis added.) Few courts have had the opportunity to pass on the retroactivity of CAFRA's provisions, but those that have done so appear to have looked solely to when the civil forfeiture complaint was filed vis-a-vis the effective date of the Act, and not to when the fraudulent acts underlying the forfeiture action took place. For example, in *United States v. Six Negotiable Checks,* 207 F.Supp.2d 677 (E.D.Mich.2002), the court held that CAFRA's heightened burden of proof[5] applied to a case that the government had commenced more than eight months after CAFRA's effective date. *Id.* at 682. Although the underlying acts giving rise to the forfeiture action had taken place in 1998, the court made no reference to that fact in holding that the CAFRA standards were controlling. *Id.* The court simply noted that, "by its express terms," CAFRA applies to any forfeiture proceeding commenced on or after August 23, 2000. *Id.*

Other courts, confronting the situation where the forfeiture action was already pending prior to the effective date of CAFRA, have held that Congressional intent concerning CAFRA's applicability is clear and unambiguous, and that there is therefore no need to conduct the analysis set forth in *Landgraf.* *See, e.g., United States v. $80,180.00 in U.S. Currency,* 303 F.3d 1182, 1185 (9th Cir.2002) ("Congress manifested a clear intent to apply CAFRA[ ] ... only to judicial forfeiture proceedings in which the government's complaint was filed on or after August 23, 2000 . . . ." and "did not intend to apply the new law to cases filed before but pending on the effective date"); *United States v. Portrait of Wally,* No. 99 Civ. 9940, 2002 WL 553532, at *14 (S.D.N.Y. Apr.12, 2002) ("Because Congress has explicitly prescribed the statute's reach," use of the *Landgraf* default rule was not warranted and pre-CAFRA law applied to forfeiture case commenced in 1999).[6]

■ The government commenced the instant forfeiture action on April 2, 2001, more than six months after the effective date of CAFRA. This court agrees with the holdings in the above cases that Congressional intent is clear and express: CAFRA, by its terms, "shall" apply to all forfeiture cases commenced on or after August 23, 2000. It therefore applies here. Had Congress wanted to exclude from CAFRA's reach cases that are commenced after the effective date of the Act but where the underlying fraudulent conduct occurred prior to the effective date of the Act, it could have done so.[7] Since it did not, and since there is nothing ambigu-

---

5. CAFRA alters the burdens borne by the parties to a civil forfeiture proceeding. Where the government previously had to demonstrate only "probable cause" to discharge its initial burden, it now must "establish, by a preponderance of the evidence, that the property [at issue] is subject to forfeiture." 18 U.S.C. § 983(c)(1).

6. *But see United States v. Real Property in Section 9, Town 29 North, Range 1 West Twp. of Charlton,* 241 F.3d 796 (6th Cir.2001) (using *Landgraf* analysis to find CAFRA standards applicable to case that was on appeal to the Circuit Court at the time CAFRA was enacted). The holding in this case was heavily criticized by the court in *Six Negotiable*

*Checks,* 207 F.Supp.2d at 683 n. 7, and the court in *Portrait of Wally,* 2002 WL 553532, at *14, expressly declined to follow it. *See also* David L. Goldberg, *A Retroactive Limitations Period for Pending Cases Under Sarbanes–Oxley?,* 8 No. 16 Andrews Sec. Litig. & Reg. Rep. 22 (2003) (opining that *"Real Property* was wrongly decided" because "Congress spoke with absolute clarity when it legislated that CAFRA applied to forfeiture proceedings 'commenced' 120 days after its effective date").

7. Indeed, as the government points out, it was obvious to Congress that any civil forfeiture case commenced shortly after the effective date of the Act would, by necessity, be based

ous in the statute's language concerning its reach or applicability, there is no need to conduct the *Landgraf* retroactivity analysis.

Contrary to claimant's argument, *Immigration and Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), does not counsel a different result. In *St. Cyr*, the Supreme Court held that the "mere promulgation of an effective date for a statute" is ambiguous and does not provide sufficient evidence that Congress considered the "potential unfairness" of retroactive appli-

cation. *Id.* at 317, 121 S.Ct. 2271. The Court found that a "statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." *Id.* However, CAFRA is distinguishable from the statute at issue in *St. Cyr*, since its clear language does much more than merely announce an effective date.[8] Indeed, the statute could not be more precise: it "shall apply to any forfeiture proceeding commenced on or after the date that is 120 days after the date of enactment of this Act."[9] Since

on activities that occurred prior to the effective date. (*See* Transcript of Oral Argument, dated November 19, 2002, at 20.)

**8.** *St. Cyr* is distinguishable on other grounds, as well. *St. Cyr* involved a lawful permanent resident who was ordered deported after pleading guilty to selling a controlled substance. The petitioner would have been eligible for a waiver of deportation from the Attorney General under the immigration law in effect when he pleaded guilty, but his removal proceedings were commenced after the effective dates of the Antiterrorism and Effective Death Penalty Act (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which repealed provisions allowing for discretionary relief from deportation.

In conducting the *Landgraf* analysis, the Court expressed concern that the statutes at issue attached new legal consequences to "conduct that occurred before their enactment." *St. Cyr*, 533 U.S. at 292–93, 121 S.Ct. 2271. By "conduct," however, the Court was referring to the guilty plea, and not to the criminal acts giving rise to the guilty plea. In other words, the Court found that the statutes could not be applied retroactively because of the harsh result that would ensue were they to apply to someone who made a conscious decision to plead guilty in reliance on established law and with the reasonable expectation that he would be eligible for a waiver of deportation. Since Dr. Abdi pleaded guilty to federal health care fraud on April 23, 2001, after the effective date of CAFRA, the statute did not change the legal consequences of the

plea. Thus, no such manifest unfairness is present here.

**9.** *United States v. Eleven Vehicles*, 898 F.Supp. 1143 (E.D.Pa.1995), is likewise distinguishable. In *Eleven Vehicles*, the court analyzed the application of the 1988 amendments to section 981(a)(1)(A) of the civil forfeiture statute, which broadened the statute to define forfeitable property as including "any property, real or personal, involved in a transaction in violation of . . . section 1956 or 1957. . . ." Since the criminal acts giving rise to the forfeiture action in *Eleven Vehicles* occurred before the critical "involved in" language was added to the statute, the court applied the *Landgraf* analysis. It noted that "[i]n enacting the November 18, 1988 amendments, Congress did not indicate whether it intended the amendments to apply to money laundering occurring before the enactment date." It therefore looked to *Landgraf*'s presumption against retroactivity and to whether the amendments would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." It concluded that "[t]he amendments to § 981(a)(1)(A) may not be applied retroactively to forfeit facilitating property or proceeds thereof based on prohibited money laundering occurring prior to November 18, 1988." *Id.* at 1155. In *United States v. $814,254.76 in U.S. Currency*, 51 F.3d 207 (9th Cir.1995), the court also noted that the statute at issue, 18 U.S.C. § 984, was silent on the question of its applicability. Conducting the *Landgraf* analysis, the court found that the statute attached "new legal consequences to events completed before its enactment," and

Congress has "expressly prescribed the statute's proper reach," there is "no need to resort to judicial default rules" and the court need not move on to step two of the *Landgraf* analysis. *See Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483. Accordingly, claimant's motion for judgment on the pleadings with respect to the first, third, fifth, seventh, and ninth claims is denied. For this reason, as well, the court must deny claimant's request to have the pre-CAFRA version of the innocent owner defense apply in this case.[10]

### 2. Claims brought under 18 U.S.C. § 1957

The remaining claims in the complaint seek forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) of properties involved in money laundering in violation of 18 U.S.C. § 1957. Claimant puts forth essentially three arguments for why she believes these claims should be dismissed. First, claimant asserts that they fail to allege an essential element of a § 1957 offense; namely, a monetary transaction involving the proceeds of fraudulent activity. (*See* Claimant's Mem. at 14.) Second, she argues that the complaint fails to allege transactions involving over $10,000. (*Id.* at 16–18.) Finally, she argues that these claims are, in large part, barred by the one-year statute of limitations for civil forfeiture actions involving fungible property. (*Id.* at 15.) I will address these arguments in turn.

### a. What Constitutes a "Monetary Transaction" *Involving* "Proceeds" *of Fraudulent Activity?*

■ Claimant contends that "[n]one of the deposits that [Dr.] Abdi made to the Dime Account of the Medicare or Medicaid checks that he had received as a result of his fraud can properly be the basis of a forfeiture claim" because funds cannot be deemed "proceeds" used in a monetary transaction until the check has been deposited *and has cleared.* (Claimant's Mem. at 7) (emphasis added.) In other words, in order for funds to be considered proceeds of a crime that are subject to forfeiture, the defendant had to have obtained "possession or control of the funds that were the object of the scheme to defraud before he engaged in the monetary transaction that is allegedly violative of the statute." (*Id.* at 8.) Since the checks did not clear until after they were deposited, claimant argues, Dr. Abdi did not obtain possession or control over the funds until after the deposits, which means that none of the deposits themselves can "serve as a predicate act for a money laundering offense under § 1957." (*Id.* at 9.)

18 U.S.C. § 1957 prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property," which is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(a), (f)(2). Claimant is therefore correct that money laundering

that it therefore could not be applied retrospectively. *Id.* at 209.

Here, by contrast, Congress *did* articulate its clear intent for the amendments in CAFRA to apply to all cases commenced after the effective date of the Act, without regard to when the fraudulent conduct underlying the forfeiture action occurred. Indeed, the language tracks very closely language that the Court in *Landgraf* held would be sufficient to convey a "determinate meaning." *See Landgraf*, 511 U.S. at 259–60, 114 S.Ct. 1483

("[h]ad Congress wished § 402(a) to have such a determinate meaning, it surely would have used language comparable to ..." "shall apply to all proceedings pending on or commenced after the date....").

**10.** 18 U.S.C. § 983(d) amended the statutory innocent owner defense to civil forfeiture. For property acquired after the commission of the crime, the CAFRA amendment, § 983(d)(3)(A), limits the innocent owner defense to bona fide purchasers for value. Prior

"must be a crime distinct from the crime by which the money is obtained," which in turn means that "[t]he money laundering statute ... is a prohibition of processing the fruits of a crime or of a completed phase of an ongoing offense." *United States v. Abuhouran*, No. CR. A. 95–560–04, 2001 WL 849716, at \*1–\*2 (E.D.Pa. July 12, 2001) (citing *United States v. Conley*, 37 F.3d 970, 980 (3d Cir.1994)). *See also United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir.2001) ("Our case law consistently distinguishes between the crime that produces proceeds and the subsequent crime of laundering those proceeds, even though the transactions may flow together").

The question here is whether depositing a check received as a result of criminal activity constitutes "a monetary transaction in criminally derived property" under § 1957. Numerous courts have answered this question in the affirmative. *See United States. v. Lomow*, 266 F.3d 1013, 1018 (9th Cir.2001) ("depositing the check ... constituted a separate transaction from the fraud that generated the funds"); *United States v. Cefaratti*, 221 F.3d 502, 510–11 (3d Cir.2000) (deposit of fraudulently obtained student loan checks is money laundering because the checks became criminally derived property once endorsed) (cited with approval in *McCarthy*, 271 F.3d at 395); *United States v. Graffia*, No. 93 CR 842, 1995 WL 374127, at \*3 (N.D.Ill. June 21, 1995) ("The term 'monetary transaction' includes the deposit of a check").

The cases claimant cites in support of her position, all of which involved criminal charges of bank fraud, are inapposite. *United States v. Piervinanzi*, 23 F.3d 670 (2d Cir.1994), stands for the simple proposition that before a person can launder money he or she must first have obtained it illegally.[11] The court in *Piervinanzi* did not state that one only "obtains" illegal proceeds of a fraud when the check clears, or that depositing a check received as a result of fraudulent activity cannot constitute a "monetary transaction in criminally derived property."

Claimant also cites *United States v. Christo*, 129 F.3d 578, 580 (11th Cir.1997). The government in that case contended that the act of depositing checks in a check-kiting scheme constituted money laundering. The defendant countered that, because the predicate offense of bank fraud required execution (*i.e.*, the movement of funds from the financial institution), the money allegedly laundered did not constitute the proceeds of crime until after the deposit. In other words, the defendant claimed that the last act of bank fraud could not have constituted the money laundering transaction, since the two offenses needed to be separate. The court agreed, stating that "the underlying criminal activity must be complete before money laundering can occur." *Id.* at 580. The Eleventh Circuit explained that the money

---

to that amendment, the innocent owner defense was not so limited.

**11.** In *Piervinanzi*, the defendants in a bank fraud case attempted the illegal transfer of $24 million from Morgan Guaranty to their account at a bank in London, via a correspondent bank account at Bankers Trust in New York. The funds were wire transferred to Bankers Trust, but the scheme was discovered and therefore the funds never made it to their account in London. The defendants were

charged and convicted for both wire fraud and money laundering based on the Bankers Trust wire transfer. On appeal, defendants argued that the money did not constitute "criminally derived property" because they never "obtained" the funds. The government joined in the defendants' motion. The court agreed, holding that "the proceeds of a crime [must] be in the defendant's possession before he can attempt to transfer those proceeds in violation of § 1957." *Piervinanzi*, 23 F.3d at 677. *Piervinanzi* is therefore distinguishable

laundering statutes punish transactions in proceeds, not the transactions that create those proceeds. Because bank fraud does not generate its proceeds until after execution, *i.e.,* until the money is in the account of the perpetrator, the defendant in *Christo* could not have engaged in the separate act of money laundering. *Christo* is entirely distinguishable from the instant case, in which Dr. Abdi's fraudulent acts were completed before he engaged in the separate act of depositing the proceeds derived from those acts. Depositing the checks was *not* part and parcel of the predicate fraudulent conduct.

*United States v. Napoli*, 54 F.3d 63 (2d Cir.1995), and *United States v. Seward*, 272 F.3d 831 (7th Cir.2001), are distinguishable for the same reason. Both involved acts of bank or wire fraud, in which the deposit or transfer at issue constituted the original acquisition of the monies by fraud, and not separate monetary transactions.[12]

Finally, claimant contends that the United States Attorney's Office "recently took a directly contrary position before the Second Circuit Court of Appeals" in *United States v. All Funds*, 99 CV 1453, 2001 WL 1150217 (E.D.N.Y. Sept.21, 2001) (appeal pending). *All Funds* was a forfeiture case involving a fraudulent scheme in which Medicare checks were deposited into a bank account; the commingled funds from the bank account were then transferred to a pension fund, which was later terminated. The pension plan's assets were then distributed to the claimants' individual IRA accounts, which were the subject of the forfeiture action. *Id.* at *1. The claimants moved to dismiss the case on statute of limitations grounds, and the district court found that the action was time-barred by the one-year statute of limitations in 18 U.S.C. § 984(a)(1),[13] which applies to property that is "fungible." *Id.,* 2001 WL 1150217, at *2. On appeal, the government argued for the application of

---

from the case at bar, in which Dr. Abdi clearly obtained the funds at issue.

**12.** Indeed, in *Seward* the court upheld the defendant's conviction on money laundering charges, explaining that "[a]lthough it is true that the defendant must have control of the proceeds of a fraudulent transaction before he can engage in money laundering with those proceeds, there is no requirement that the entire fraudulent scheme be complete before the defendant starts laundering the proceeds from early portions of the scheme." *Seward*, 272 F.3d at 836.

**13.** Section 984 provides in relevant part as follows:

(a) This section shall apply to any action for forfeiture brought by the Government in connection with any offense under section 1956, 1957, or 1960 or section 5322 of title 31, United States Code.

(b)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or other fungible property—

(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2) Except as provided in subsection (c), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(c) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

18 U.S.C. § 984. Section 984 thus authorizes broad "substitute" seizures, but it simultaneously tempers the additional power given the government by means of a shorter statute of limitations. *See U.S. v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at American Exp. Bank*, 832 F.Supp. 542, 558 (E.D.N.Y.1993).

the five-year statute of limitations under 18 U.S.C. § 981(d),[14] which, according to the district court, only applies if the proceeds of money laundering constitute "specific" and "identifiable" property. *Id.* In its reply brief on appeal, the government asserted that when the claimants transferred the monies from the bank account to the pension fund, knowing that some of those monies represented the proceeds of "specified unlawful activity," they engaged in money laundering transactions in violation of 18 U.S.C. § 1956. (*See* Reply Brief for Plaintiff–Appellant in *All Funds,* annexed to Claimant's Reply Mem. as Appendix A.) The government argued that it was those money laundering transactions, and not the original deposits into the bank account, that were at issue in the case. Nowhere did the government argue that the original deposits did not constitute money laundering transactions.[15]

Regardless, even if the United States Attorney's Office did take a contrary position in another case, I find its argument in this case persuasive. I therefore find that the complaint properly alleges monetary transactions in criminally derived property with respect to the Dime Savings Bank Account.

b. *Transfers Exceeding $10,000/ Motion to Amend Complaint*

Next, claimant argues that the forfeiture complaint fails to allege with particularity that any transfer of criminally derived property from the Dime Savings Bank Account was for more than $10,000. Claimant is correct that 18 U.S.C. § 1957 makes it a federal criminal offense for one to "knowingly engage[ ] or attempt[ ] to engage in a monetary transaction in criminally derived property *that is of a value greater than $10,000* and is derived from specified unlawful activity." (emphasis added.) Thus, the government must plead, as an essential element, that each monetary transaction alleged in the complaint involved more than $10,000. Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims requires that the complaint describe "the circumstances from which the claim arises" so as to enable a claimant, "without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." To satisfy Rule E(2)(a), the government must "assert specific facts supporting an inference that the property is in fact subject to forfeiture" under the forfeiture laws. *United States v. Approximately $25,829,681.80 in Funds, plus Interest, in Court Registry Investment System,* No. 98 Civ. 2682, 1999 WL 1080370, at *7 (S.D.N.Y. Nov. 30, 1999) (citing *United States v. All Right, Title & Interest in Real Property & Appurtenances Known as 288–290 N. St., Middletown, New York,* 743 F.Supp. 1068, 1074 (S.D.N.Y.1990); *United States v. All Right, Title & Interest in Real Property & a Bldg. Known as 16 Clinton St., New*

---

**14.** Section 981(a)(1)(A) provides in pertinent part:

(a)(1) [T]he following property is subject to forfeiture to the United States:

(A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 5313(a) or 5324(a) of title 31, or of section 1956 or 1957 of this title, or any property traceable to such property.

18 U.S.C. § 981(a)(1)(A).

**15.** Because claimant has only attached three pages of the government's reply brief in *All*

*Funds,* taken out of context, it is difficult for this court to ascertain the complete thrust of the argument. However, I find no direct inconsistency between the arguments made in this case concerning when funds can be deemed "proceeds" used in a monetary transaction and the argument in *All Funds,* which appeared to focus primarily on the statute of limitations issue. Moreover, *All Funds* is currently on appeal to the Second Circuit Court of Appeals.

*York, New York,* 730 F.Supp. 1265, 1267 (S.D.N.Y.1990)). The requirements of particularity under this rule are " 'more stringent than the general pleading requirements . . . [,] an implicit accommodation to the drastic nature of the civil forfeiture remedy.' " *United States v. $15,270,885.69,* No. 99 Civ. 10255, 2000 WL 1234593, at *2–*3 (S.D.N.Y. Aug.31, 2000) (quoting *United States v. Daccarett,* 6 F.3d 37, 54 (2d Cir.1993)).

■ The government does not dispute this. Rather, it points out that at least some of the transactions in the complaint are alleged to constitute monetary transac-

tions in criminally derived property that is of a value greater than $10,000. For example, the complaint alleges that in September 2000, when the Abdis used the equity in the Old Westbury House to obtain another mortgage of approximately $425,000, the deposit of those loan proceeds constituted a monetary transaction of a value greater than $10,000. (*See* Compl. ¶ 48.)[16] In addition, the complaint alleges that the Abdis deposited "at least $430,000 in proceeds of his health care fraud activities" into the Schwab Account. (*See* Compl. ¶¶ 45, 55.) According to the government, that transfer also constitutes a monetary transaction in criminally de-

---

16. Claimant argues that "[t]here are several functional defects" in the government's claim that the deposit of the mortgage proceeds violates the money laundering statutes. (Reply Mem. of Law in Support of Claimant's Motion for Judgment on the Pleadings, dated Oct. 28, 2002, at 17–18.) She contends that, although the government may forfeit equity in property acquired as a result of "tainted mortgage payments," it may "only do so to the extent and amount that criminal proceeds were actually used to pay off the principal of the mortgage." (*Id.* at 18.) According to claimant, since the Dime Savings Bank Account contained both legitimate monies and the criminal proceeds obtained from Dr. Abdi's fraudulent scheme, the government has failed to allege facts showing that the portion of the equity of the house that served as security for the new mortgage proceeds was "in fact the same equity that was acquired by the use of criminally derived proceeds for mortgage payments." (*Id.*) She also argues that the mortgage proceeds were "clean" money, and cites *United States v. Premises Known as 7725 Unity Ave. N.,* 294 F.3d 954 (8th Cir.2002), for the proposition that the government may not forfeit "innocent mortgage loan proceeds." (*Id.* at 18–19.)

This argument is misplaced. The government's position is that the funds obtained as a result of the refinancing are traceable to the fraud (and not substitute assets) because the equity used to refinance the property can be traced to the fraud. By commingling criminal proceeds with legally acquired funds, the Abdis allegedly engaged in money laundering transactions in violation of 18 U.S.C. § 1956.

*See United States v. McGauley,* 279 F.3d 62, 76 (1st Cir.2002); *United States v. Ward,* 197 F.3d 1076, 1082 (11th Cir.1999). "Where the funds used in a particular transaction originated from a single source of commingled illegally-acquired and legally acquired funds *or from an asset purchased with such commingled funds,* the government is not required to prove that no 'untainted' funds were involved, or that the funds used in the transaction were exclusively derived from the specified unlawful activity." *United States v. Moore,* 27 F.3d 969, 976 (4th Cir.1994) (emphasis added). Thus, the government need only allege that the Old Westbury House was purchased with commingled funds, and then used as equity for a loan. *Premises Known as 7725 Unity Ave. N.,* 294 F.3d 954, is inapplicable here, as it stands simply for the proposition that the *lender's* interest in property should not be forfeited even where its interest is subordinate to the government's lis pendens. Here, the government does not seek forfeiture of the lender's interest in any of the properties. (*See* Pl.'s Reply Mem. of Law in Further Support of its Cross–Motion to Amend the Complaint, dated Nov. 12, 2002, at 13.)

Moreover, as the government points out, Dr. Abdi pleaded guilty to using money he obtained through criminal conduct to make mortgage payments on the Old Westbury House. (See Goldberger Decl., Ex. 2.) The government therefore properly alleges that the equity in the Old Westbury House, which was obtained with tainted funds, served as security for the second mortgage.

**68**

rived property of a value greater than $10,000. With respect to the remaining transactions, the government seeks leave to amend and supplement the complaint to "clarify the allegations based upon 18 U.S.C. § 1957" and plead specifically that each claim based on § 1957 concerns a transaction in excess of $10,000. The government also seeks leave to allege claims based on money laundering under 18 U.S.C. § 1956 and to supplement the complaint with some facts that occurred after the original complaint was filed. (*See* Proposed Amended Complaint; Pl.'s Mem. of Law in Opposition, dated Oct. 7, 2002, at 25.)

Pursuant to Fed.R.Civ.P. 15, leave to amend "shall be freely given" in the absence of "any apparent or declared reason—such as undue delay, bad faith or dilatory motive ..., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ..., [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). An application for leave to file an amended or supplemental pleading "is addressed to the discretion of the court." *Bornholdt v. Brady*, 869 F.2d 57, 68 (2d Cir.1989).

■ Although claimant implicitly concedes that the proposed Amended Complaint addresses her objection and properly alleges that each claim based on § 1957 concerns a transaction in excess of $10,000, claimant asserts a number of other objections to the government's motion to amend. First, claimant argues that the allegations in the proposed Amended Complaint are not pled with sufficient particularity to properly allege that the assets the government seeks to forfeit are directly traceable to fraudulent activity, and therefore within the applicable statute of limitations. (*See* Tr. at 38–39, 55–62.) [17] Because it is undisputed that the Dime Savings Bank Account contained both legitimate and criminally derived funds over time, claimant argues, the government is required to allege facts showing that each transfer can be traced to specific deposits of criminally derived monies. (*Id.* at 55) ("If your Honor looks at that proposed draft amended complaint, there are no—I repeat, zero facts to show how the government is going to trace from the criminal proceeds, from the deposits to the withdrawals.")

■ However, the issue before the court is pleading, not proof at trial. Thus, the court need not pass on the government's ultimate burden of proof regarding traceability. The only question is whether the proposed Amended Complaint describes sufficiently "the circumstances from which the claim[s] arise[ ]" so as to enable claimant, "without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." (Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims.) [18] As explained, to satisfy this rule, the government need only "assert specific facts supporting an inference that the property is in fact subject to forfeiture. . . ." *United States v. Approximately $25,829,681.80 in Funds, plus Interest, in Court Registry Investment System*, No. 98

---

17. Claimant's objections are not based on undue prejudice, but on alleged futility. Indeed, claimant concedes that "there is no cognizable legal prejudice warranting denial of leave to amend." (Cl.'s Reply Mem. at 16.)

18. As the government correctly notes, courts have rejected the application of Fed.R.Civ.P. 9(b)'s heightened pleading requirement to civil *in rem* forfeiture cases. *See United States v. Approximately $25,829,681.80 in Funds (plus Interest) in the Court Registry Investment System*, No. 98 Civ. 2682, 1999 WL 1080370, at *7 (S.D.N.Y. Nov. 30, 1999) ("This Court has found no precedent for applying Rule 9(b) to a forfeiture action involving defendant-in-rem property").

Civ. 2682, 1999 WL 1080370, at *7 (emphasis added).[19] To be sure, the government "may not seize and continue to hold property upon conclusory allegations that the defendant property is forfeitable." *United States v. Certain Accounts, Together With all Monies on Deposit Therein,* 795 F.Supp. 391, 394 (S.D.Fla.1992) (citing *United States v. $38,000.00 in United States Currency,* 816 F.2d 1538, 1548 (11th Cir.1987)). *See also United States v. United States Currency, in the Amount of $150,660.00 ("$150,660.00"),* 980 F.2d 1200, 1204 (8th Cir.1992) ("Under Rule E(2)(a) the government cannot merely notice plead, as a claimant must be able to respond to the complaint with more than a general denial") (citing *United States v. $39,000 in Canadian Currency,* 801 F.2d 1210, 1216 (10th Cir.1986)). However, there is no requirement that *all* of the facts and evidence at the government's disposal be pled in the complaint; the government must simply plead enough specific facts for the claimant to understand the government's theory, file a responsive pleading that contains more than a general denial, and undertake her own investigation. *See $150,660.00,* 980 F.2d at 1204–05 ("Rule E(2)(a) does not require the government to meet, at the pleading stage, its ultimate trial burden").[20]

19. I note that the pre–2000 cases evaluating civil forfeiture complaints for particularity go on to hold more specifically that the complaint must allege sufficient facts to support a reasonable belief that the government can demonstrate probable cause for forfeiture at trial. *See, e.g., $38,000 in United States Currency,* 816 F.2d at 1548; *United States v. U.S. Currency, in the Amount of $150,660.00,* 980 F.2d at 1205; *see also United States v. Daccarett,* 6 F.3d 37, 47 (2d Cir.1993). The pleading requirement of a "reasonable belief that probable cause can be shown at trial" was apparently keyed to the government's burden of proof at the time (prior to 2000) these cases were decided. *See Daccarett,* 6 F.3d at 47. As explained *supra,* before Congress enacted CAFRA, the government's trial burden was to show probable cause for forfeiture; the burden of proof then shifted to the claimant. *See United States v. Leak,* 123 F.3d 787, 792 (4th Cir.1997); 19 U.S.C. § 1615 (superceded by 18 U.S.C. § 983(c)(1)). Now, after CAFRA's enactment, the government must prove by a preponderance of the evidence that the property is subject to forfeiture. 18 U.S.C. § 983(c)(1). In light of CAFRA's change in the burden of proof, post-CAFRA cases have simply held that a complaint under Rule E(2)(a) must "allege sufficient facts to support a reasonable belief that the property is subject to forfeiture." *See United States v. Mondragon,* 313 F.3d 862, 865 (4th Cir.2002).

20. One court has also noted that while CAFRA raises the burden of proof for the government in a civil forfeiture proceeding, "there appears to be a relaxation of the proof that the Government is required to demonstrate in response to a 12(b)(6) motion made at an earlier stage of a forfeiture proceeding." *United States v. 630 Ardmore Drive, City of Durham, Parkwood Tp., Durham County, North Carolina,* 178 F.Supp.2d 572 (M.D.N.C. 2001). The court explained that:

> Generally, for the non-moving party, a 12(b)(6) motion to dismiss does not present an insurmountable bar to the extent that the movant in order to prevail has to establish that there are no set of facts pled in the non-movant's claim that would allow relief. In essence, a non-movant can defend by showing that his or her complaint can and has set forth a set of facts that would allow relief as to the claim asserted. However, CAFRA now appears to require even less as a defense to a 12(b)(6) motion to dismiss to the extent that the statute provides that "no complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." .... Adequate evidence, as referred to in the statute, is not defined, but based upon a plain reading of the statute, *it would appear that the Government's forfeiture claim can advance forward in face of a 12(b)(6) motion to dismiss even if the Government's Complaint does not provide all the facts that would allow the Government to ultimately succeed in the forfeiture proceeding.*

*Id.* at 580–81 (emphasis added). In light of this savings clause reference to "adequate evidence" in 18 U.S.C. § 983(a)(3)(D), the court

Having reviewed the proposed Amended Complaint thoroughly, I find that the government has alleged sufficient facts to meet the particularity requirement of Rule E(2)(a). The government has offered specific information about the transactions at issue such that claimant is "adequately apprised of the factual circumstances underlying the forfeiture action." *United States v. Approximately $25,829,681.80 in Funds, plus Interest, in Court Registry Investment System*, No. 98 Civ. 2682, 1999 WL 1080370, at *7 (S.D.N.Y. Nov. 30, 1999) (citing *United States v. Premises & Property at 4492 S. Livonia Rd., Livonia, New York*, 889 F.2d 1258, 1266 (2d Cir. 1989)). The proposed Amended Complaint tracks the proceeds of the health care fraud from the Dime Savings Bank Account to the other defendant properties. This information provides the necessary details to allow claimant to frame a response and undertake an investigation. *See United States v. All Monies in Account # 42032964 at Meridian Bank, Reading, PA.*, No. 92–1996, 1992 WL 301257, at *2 (E.D.Pa. Oct.14, 1992) (civil forfeiture complaint that traced the proceeds of bank fraud from a trading account to several intermediate bank accounts to real estate that was sold, the proceeds having been deposited in the defendant bank account, fulfilled the requirements of Rule E(2)(a)).[21]

■ Claimant also objects to the addition of money laundering claims under 18 U.S.C. § 1956. She asserts that "ordinary purchases and financial transactions made with ill-gotten gains do not violate § 1956," and accordingly, that the government must allege more than the mere spending of criminal proceeds to satisfy § 1956. (Cl.'s Reply Mem. at 22.) 18 U.S.C. § 1956 is the money laundering statute. To prove its case under § 1956, the government must show four elements: (1) an actual or attempted financial transaction, (2) involving the proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) either (a) an intent to promote the carrying on of specified unlawful activity, or (b) knowledge that the transaction is designed to promote the underlying specified unlawful activity or "to conceal or disguise the nature [or] the source ... of the proceeds of specified unlawful activity." *United States v. Morelli*, 169 F.3d 798, 804 (3d Cir.1999) (citing 18 U.S.C. § 1956(a)(1)). "None of these requirements is very rigorous." *United*

---

held that "the particularity requirements for a forfeiture complaint set out in Supplemental Rule E(2) must also be viewed in a more relaxed manner on a case by case basis...." *Id.* at 581.

21. *United States v. One Partially Assembled Drag Racer*, 899 F.Supp. 1334 (D.N.J.1995), and *United States v. Pole No. 3172*, 852 F.2d 636 (1st Cir.1988), cited by claimant, are distinguishable. In *One Partially Assembled Drag Racer*, the court held that the civil forfeiture complaint was inadequate because it alleged only the predicate violations of the customs laws and the Controlled Substances Act with particularity. The complaint did not allege when the claimant purchased the property at issue, how much he paid for it, whether he purchased it with cash or in a suspicious manner, or whether he earned income from sources other than criminal enterprises. The court therefore found the complaint's barebones, conclusory statement that the property was traceable to proceeds from sales of controlled substances "too vague to pass muster under Rule E(2)(a)." *One Partially Assembled Drag Racer*, 899 F.Supp. at 1341. Likewise, in *Pole No. 3172*, the complaint merely described the property at issue and, "parroting the language of the statute, stated that it was forfeitable as proceeds of a drug transaction." *Pole No. 3172*, 852 F.2d at 638–39. Here, by contrast, the 23–page proposed Amended Complaint contains considerable detail as to the amount of money Dr. Abdi received through criminal conduct, as well as the amounts and dates of the transfers and the properties purchased.

*States v. Howard,* No. CRIM. A. CR 99–120, 1999 WL 504561, at *1 (E.D.Pa. July 15, 1999).

Again, this is an issue of pleading, not proof. Here, the government alleges that, by commingling illegally derived proceeds with legitimate funds with the intent of concealing or disguising the source of the proceeds, Dr. Abdi engaged in money laundering transactions. Such allegations state a claim under § 1956. *See United States v. McGauley,* 279 F.3d 62, 76 (1st Cir.2002) (jury was properly instructed that the commingling of tainted funds with legitimate funds is enough to expose the legitimate funds to forfeiture, if the commingling was done "for the purpose of concealing the nature or source of the tainted funds"); *United States v. Bornfield,* 145 F.3d 1123, 1135 (10th Cir.1998) ("forfeiture of legitimate and illegitimate funds commingled in an account is proper as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the nature and source of, his scheme"); *United States v. Iacaboni,* 221 F.Supp.2d 104, 114–15 (D.Ma.2002) ("a person may commit money laundering merely by depositing the proceeds of an unlawful activity into a bank account in his own name, so long as he does so in order to 'to conceal or disguise' the illegal nature or source of those funds"); *United States v. Certain Funds on Deposit In Account No. 01–0–71417, Located at the Bank of New York,* 769 F.Supp. 80, 85 (E.D.N.Y.1991) ("It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue"). *See also United States v. All Funds Presently on Deposit or Attempted to be Deposited in any Accounts Maintained at American Exp. Bank,* 832 F.Supp. 542, 560–61 (E.D.N.Y.1991) ("a cause of action to forfeit property ... under 18 U.S.C. § 1956 accrues when the proceeds of that violation are deposited into a volatile ac-count, since the deposits may then be deemed as designed 'to conceal or disguise the nature, the location, or the control of the proceeds' ").

Claimant correctly states that a money laundering conviction under § 1956 "requires more than proof of the spending of the ill-gotten gains." *United States v. Stephenson,* 183 F.3d 110, (2d Cir.), *cert. denied,* 528 U.S. 1013, 120 S.Ct. 517, 145 L.Ed.2d 400 (1999). *See also United States v. Dobbs,* 63 F.3d 391, 398 (5th Cir.1995) ("where the use of the money was not disguised and the purchases were for family expenses and business expenses ..., there is ... insufficient evidence to support the money laundering conviction"); *United States v. Rockelman,* 49 F.3d 418, 422 (8th Cir.1995) (Section 1956 should not be interpreted to criminalize ordinary spending of drug sale proceeds); *United States v. Garcia–Emanuel,* 14 F.3d 1469, 1476 (10th Cir.1994) (Section 1956(a)(1) "is a concealment statute—not a spending statute"). However, in its complaint, the government alleges more than mere spending of money; it alleges an intent to conceal the source, ownership or control of the funds put into the Dime Savings Bank Account and the defendant properties. Whether or not the government ultimately will prevail on this claim is not presently before the court, but the facts alleged are sufficient to state a cause of action under § 1956. *See, e.g., Howard,* 1999 WL 504561, at *3 (transfer of funds to a personal account owned by claimant and her mother demonstrated an intent to conceal the source, nature, location, ownership, and control of proceeds derived from bank and wire fraud).

■ Finally, claimant argues that the court should award her attorney's fees and conduct a probable cause hearing if it grants the government's motion to amend. (*See* Reply Memorandum of Law in Sup-

port of Claimant's Motion for Judgment on the Pleadings, dated Oct. 28, 2002, at 16, 25–26.) On the issue of attorney's fees, it is true that courts have discretion to award fees in the unusual situation where an opposing party will suffer prejudice as a result of an amendment. *See Mohideen v. American Airlines, Inc.,* No. 99 Civ. 0016, 1999 WL 714089, at *3 (S.D.N.Y. 1999) ("a court granting a party leave to amend may impose reasonable conditions which 'take into account any prejudice that the opposing party will suffer as a result of the amendment,' . . . the most common of which is the imposition of costs") (citations omitted); *Hayden v. Feldman,* 159 F.R.D. 452, 455 (S.D.N.Y.1995) (awarding fees to defendant who "would not have been put to the expense of moving to dismiss the faulty Third Amended Complaint had plaintiffs filed a proper complaint at the outset" where plaintiffs "conceded that seventy-five percent of the work done by [defendant's] attorneys [was] 'unnecessary' " and was caused by "plaintiffs' decision to proceed in [an] inefficient manner"). Such fees and costs are generally awarded, however, only after the defendant has been compelled to file multiple motions to dismiss. *See Health & Community Living, Inc. v. Goldis Fin. Group, Inc.,* No. 96 CV 0459, 1998 WL 117928, at *6 (E.D.N.Y. Mar.13, 1998) (denying motion for costs where defendant "was not required to file a second motion to dismiss"). Unlike plaintiffs who file numerous amended complaints that fail to address problems raised in motions to dismiss, the government here seeks to amend its complaint for the first time. I find no prejudice warranting an award of fees. Claimant's request for attorney's fees is, therefore, denied.

Claimant also cites *Krimstock v. Kelly,* 306 F.3d 40 (2d Cir.2002), for the proposition that a prompt probable cause hearing is "constitutionally required" in this case. (Cl.'s Reply Mem. at 27.) However, that case does not support claimant's argument. The plaintiffs in *Krimstock* brought an action under 42 U.S.C. § 1983 challenging New York City Code § 14–140, which authorizes the warrantless seizure of vehicles used to commit a crime, including the misdemeanor of driving while intoxicated. The Second Circuit held that claimants whose vehicles are seized without a warrant are entitled to a prompt probable cause hearing under the fourth and fourteenth amendments. *Id.* at 50–53. However, the court explicitly distinguished the statute at issue in that case from other forfeiture statutes, including the federal forfeiture statutes, noting that other statutes contain special provisions not present in New York City Code § 14–140, such as innocent owner provisions and provisions allowing for the release of property where the claimant can show that continued possession by the government would pose a "substantial hardship." *Id.* at 55–56, 58 n. 19, 61, 62 n. 23. Indeed, as the government points out, the court here made a determination of probable cause when it issued a warrant for the funds in the brokerage accounts, and—unlike the vehicles in *Krimstock*—the real properties at issue have not been physically seized. Since the civil forfeiture statutes at issue in this case differ significantly from the statute before the court in *Krimstock,* I find *Krimstock* inapplicable. No probable cause hearing is required or necessary at this point.

### B. *Motion to Amend the Answer*

Although the government initially opposed claimant's motion to amend her answer to assert a statute of limitations defense, it now withdraws that objection, pointing out that its objection would be moot if it were granted leave to amend its complaint, since claimant "would have an opportunity to replead her answer as a matter of right." (Pl.'s Reply Memorandum of Law in Further Support of its

Cross–Motion to Amend the Complaint, dated Nov. 12, 2002, at 14 n. 4.) Because the court is granting the government's motion to amend, claimant will have the opportunity to serve and file an answer to the amended complaint and to assert any defenses she deems appropriate. It is therefore unnecessary for the court to address the merits of the statute of limitations defense at this time.

## CONCLUSION

For the reasons stated above, claimant's motion to dismiss the complaint is denied. Plaintiff's cross-motion for leave to amend the complaint is granted, and claimant may replead her answer accordingly.

SO ORDERED.